# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOEY GRIFFIN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 7:12-976 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Joey Griffin ("Griffin") seeks review of an adverse decision on his applications for disability insurance benefits under the Social Security Act.

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Similarly, reviewing courts cannot resolve evidentiary conflicts or appraise credibility of witnesses, including claimants. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Neither can reviewing courts overturn administrative

rulings because they would reach different conclusions were the matter to come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

## I. Background

Griffin seeks social security disability insurance benefits for disability due to herniated discs in his neck and back injuries. (T. 124).[1] Administrative law judge, Marie Greener, (ALJ Greener) denied Griffin's application. (T. 21-28). The Appeals Council declined review; Griffin then instituted this proceeding.

## II. Commissioner's Decision

ALJ Greener found that Griffin has herniated discs at the cervical and lumbar spines without nerve root or spinal cord impingement.[2] (T. 23). These impairments are severe in the sense that they produce more than minimal functional limitations, but are not so extreme in degree as to be presumptively disabling. Rather, Griffin retains functional capacity to perform a full range of work-related activities at the sedentary exertional level. (T. 26).

Given this reduced residual functional capacity, ALJ Greener found that Griffin can no longer perform his past relevant work as a supervisor or laborer in heavy-exertion construction. (T. 27). ALJ Greener concluded, however, that Griffin can perform alternative, available work, and, therefore, "has not been

---

[1]     "T." followed by a number refers to the page of the administrative record. (Dkt. No. 9).

[2]     Although not claimed as a disabling impairment by Griffin, ALJ Greener's review of medical record evidence disclosed notations of left carpal tunnel syndrome. Lack of objective medical findings (*e.g.*, Electromyographic study) and absence of any manipulative restrictions caused her to find this to be a "non medically determinable condition." (T. 25 26).

under a disability." (*Id.*).  ALJ Greener relied on Medical-Vocational Guidelines, Rule 201.28, to reach these latter findings, and Griffin's claim was denied.[3]

### III.  Points of Error

Griffin's brief proffers three related errors:

1.  the ALJ"'s residual functional capacity finding is unsupported by substantial evidence;

2.  the ALJ's credibility determination is unsupported by substantial evidence; and

3.  the ALJ's Step 5 determination is unsupported by substantial evidence.

(Dkt. No. 12, pp. 1, 9-21).  Under this district's practice, the parties marshal their arguments on these issues through competing briefs.[4]

### IV.  Introductory Considerations

*A.    Decisional Context*

Administrative law judges utilize a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)).  When such evaluations reach Step 4, adjudicators determine whether claimants can perform their past

---

[3]    ALJ Greener's complete findings and conclusions appear on five pages, T. 23 27, of the administrative transcript contained in the record before the court.  (Dkt. No. 9).

[4]    *See* General Order #18 dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders).  (Dkt. No. 2).

relevant work. If not, adjudicators proceed to Step 5 where the inquiry centers on whether claimants can still perform alternative and available work.[5]

Step 4 and Step 5 findings are made in context of a predicate residual functional capacity finding. "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.

Early cases viewed residual functional capacity assessments as purely medical determinations. *See Tolany v. Heckler*, 756 F.2d 268, 271 (2d Cir. 1985) ("[r]esidual functional capacity is a medical assessment"). It is now clear, however, that descriptions and observations of limitations from all sources, including claimants and lay persons are admissible and relevant.[6]

Consequently, administrative law judges must make *credibility assessments*, that is, decide how much weight to give particular items of

---

[5]  A full discussion of the Commissioner's five step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05 CV 932, 2008 WL 759076, at *1 2 (N.D.N.Y. Mar. 19, 2008).

[6]  The Commissioner's regulation provides:

We will assess your residual functional capacity based on all the relevant medical *and other evidence*. . . . We will consider any statements about what you can still do that have been provided by medical sources, *whether or not they are based on formal medical examinations*. We will also consider descriptions and observations of your limitations from your impairment(s), *including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons*.

20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (emphasis added).

evidence. Through various regulations and internal policy rulings, the Commissioner provides guidance. There are prescribed protocols for determining credibility of subjective testimony, opinions of "treating" sources, opinions of "acceptable" medical sources, and opinions of "other" medical sources." *See*, *infra*, Section V.*C*.3. Generally, these rules follow similar patterns. Testimony and other evidence are compared to objective factors that generally enhance or support credibility. The closer the evidence matches objective factors, the more credible it is.

B.    *Nature of Griffin's Challenges*

Griffin characterizes all three of his alleged errors as *substantial evidence* points. The first two, however, essentially complain of *legal* errors, *viz.*, alleged misapplication of legal principles governing credibility assessments. In his first point (directly attacking residual functional capacity determination), Griffin argues that ALJ Greener disregarded rules and regulations for assessing medical source evidence. His second point (indirectly challenging the residual functional capacity finding) asserts that ALJ Greener ignored rules and regulations for evaluating his subjective lay testimony.

Griffin correctly identifies his third point as a substantial evidence error. He argues that Medical-Vocational Guidelines constitute substantial evidence for findings of (a) capacity to perform alternative available work and (b) non disability only when claimants have solely *exertional* limitations. Here, according to Griffin, the guidelines are not determinative because  under an accurate residual functional capacity assessment  he also has *nonexertional* limitations. Griffin asserts that absence of testimony from an expert vocational witness or equivalent evidence in that circumstance deprives a Step 5 finding of substantial evidentiary support.

# V.  Medical Opinion Evidence

Griffin's first point of error focuses on evidence from four medical sources: Dr. Harbinder Toor, M.D., a consultative orthopedic examiner; David Adams, P.A., a physician's assistant who treated Griffin; Richard Edwards, RPA-C, a registered and certified physician's assistant who conducted a "second opinion" evaluation; and Dr. Ayaz Khan, M.D., a pain management specialist.

## A.    Medical Source Evidence

### 1.    Dr. Toor

Dr. Toor conducted a full consultative orthopedic examination.[7]  Based thereon, he opined that Griffin's herniated disk disease and history of lower back

---

[7]    Dr. Toor's examination notes reflect that Griffin complained of constant neck pain, allegedly causing him difficulty twisting the neck spine, pushing, pulling, lifting and reaching as well as sitting and driving. (T. 183). Griffin reported that he cleaned once a week, shopped once a month, regularly showered and dressed himself daily, and watched television, listened to the radio, and did Sudoku puzzles. (*Id*.).  On examination, Dr. Toor observed that Griffin had a normal gait; could walk on his toes and heels and rise from a chair without difficulty; perform a full squat; and could get on and off the examination table without assistance.  (T. 184).

Dr. Toor noted that Griffin's cervical spine flexion was to 10 degrees, extension was 0 degrees, and lateral flexion was to 20 degrees, and radiation was to 20 degrees.  (T. 184).  He had no spasms or trigger points.  (*Id*.).  Griffin had the full range of motion of elbow, forearms, wrists, and fingers bilaterally; no joint inflammation, effusion, or instability; full strength (5/5) in proximal and distal muscles; no muscle atrophy; and no sensory abnormality.  (*Id*.).

Griffin's thoracic and lumbar spine forward flexion was to 50 degrees, extension was to 0 degrees, lateral flexion was to 30 degrees, and rotation was to 30 degrees with pain.  (T. 184).  He tested positive for a straight leg raising test bilaterally both supine and sitting at 20 degrees. (*Id*.).  Dr. Toor reported there was no SI joint or sciatic notch tenderness; no spasm; no scoliosis or kyphosis; and no trigger points.  (*Id*.).  Griffin had full range of motion in his lower extremities; full strength (5/5) in proximal and distal muscles; no muscle atrophy; and no sensory abnormality.  (*Id*.).

Lumbar and cervical spine radiological studies were performed and showed a transitional L5 with otherwise normal results and a normal cervical spine. (T. 186 87).  Dr. Toor diagnosed a history of herniated disk disease and a history of lower back pain.  (T. 185).

pain produce moderate limitations for standing, walking, sitting, bending, pushing, pulling, twisting, reaching and extending of the neck spine. (T. 185).

ALJ Greener gave "little weight" to Dr. Toor's opinion "because his findings are more restrictive than those of *Dr. Adams* below, who is the claimant's treating *physician* and who is better familiarized with his medical record and response to treatment." (T. 25) (emphasis added).

## 2. Physician Assistant Adams

Physician assistant Adams was Griffin's primary treating source. (T. 41, 137). Adams completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical),"[8] opining that Griffin can lift and carry up to 10 pounds, sit for six hours alternating positions (if periodically alternated positions to alleviate pain or discomfort), and stand/walk up to two hours, in an eight-hour workday. (T. 252-53). Adams concluded that Griffin can occasionally climb, balance, kneel, crouch, and stoop but he can never crawl. (T. 254). Also, Griffin

---

[8] Severity regulations speak of a claimant's ability to perform basic work related activities, *i.e.*, the abilities and aptitudes necessary to do most jobs. Examples of these include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b). In order to evaluate a claimant's *physical abilities*, the Regulations require an ALJ assessment of the claimant's ability to sit, stand, walk, lift, carry, push, and pull. *See* 20 C.F.R. §§ 404.1545(b), 416.945(b).

has no manipulative limitations (*i.e.*, he has unlimited reaching, handling, fingering, and feeling) and no visual or communicative limitations. (T. 254). He has one environmental limitation requiring that he avoid machinery with intense vibration. (T. 255).

ALJ Greener assigned "some weight" to physician assistant Adams's opinions. (T. 25-26). Indeed, her ultimate residual functional capacity finding essentially adopts Adams's assessment of Griffin's ability to engage in work activities. (T. 26). The only portions rejected or not adopted were Adams's assessments of an environmental limitation, a need to alternate sitting positions and a restriction to never crawl. (T. 25-26, 253, 255).

### 3. Physician Assistant Edwards

 Griffin was evaluated only once by Edwards on the advice of Griffin's attorney to obtain a second opinion regarding Griffin's "disability status" and for continuation of his narcotic pain medication, Oxycontin. (T. 198). Edwards observed that Griffin was "in no obvious distress" during the examination. (T. 198). He assessed Griffin with chronic low back pain, chronic neck pain, and tobacco use disorder. (*Id.*).

Edwards could not prescribe narcotics for Griffin's back and neck problems, but offered to refer him to a pain management clinic; or refer him to an orthopedic specialist; or continue with the physical examination. (T. 198). Griffin advised that he had already been to physical therapy and it was not helpful to him. (*Id.*). Griffin also indicated that he was not interested in either the Pain Management Clinic or seeing a specialist. (*Id.*). Edwards recorded that Griffin's primary interest was in getting a second opinion on disability status and continuing with his narcotic medications. (*Id.*).

ALJ Greener stated that she gave "great weight" to physician assistant Edwards's evidence because Edwards "evaluated the claimant personally in the course of care and [his] opinions are consistent with the preponderance of the medical evidence." (T. 25).

4.    Dr. Khan

Dr. Khan examined Griffin on the referral of Dr. Gary Berk, M.D., a family practice physician associated with the Hermon Family Health Care and PA Adams. Griffin's chief complaint was neck pain. (T. 249). Griffin was on a high dose of opioids, Oxycontin, for pain control. (T. 249). Griffin reported the pain as constant unbearable pain, rated on that day as 5/10. (*Id.*).

Dr. Khan initially reported that Griffin had full range of motion in his *neck* (T. 249), but subsequently found some limitation in the range of motion in Griffin's *cervical spine*. (T. 249-50). Otherwise, Dr. Khan reported the musculoskeletal/neurological examination produced normal results, including normal gait; intact muscle tone, coordination, and strength in all extremities; normal deep tendon reflexes in upper and lower extremities; and negative straight leg raising. (*Id.*). Based on review of laboratory and Magnetic Resonance Image (MRI) data, Dr. Khan's impression was chronic neck pain, cervical spondylosis, and cervical radiculopathy with use of opioids for pain control. (T. 250).

Dr. Khan offered Griffin a trial of epidural steriod injection and trigger point injections; however, Griffin declined treatment, alleging that he is allergic to steroids and afraid of needles. (T. 250). Dr. Khan also recommended that Griffin change to another medication that had less incidence of tolerance

development.[9] (*Id.*). Although conceding that he lacked proof, Dr. Khan opined that Griffin's behavior was "suspicious" for narcotic abuse. (*Id.*).

ALJ Greener also stated that she afforded "great weight" to Dr. Khan's evidence because he "evaluated the claimant personally in the course of care and [his] opinions are consistent with the preponderance of the medical evidence." (T. 25).

## B.  *Griffin's Challenges to Weighting of Medical Source Evidence*

Dr. Toor's evidence was more favorable to Griffin than the three other medical sources. ALJ Greener, however, afforded "little weight" to Dr. Toor's opinions, while giving "some weight" and "great weight" weight to findings and opinions of the remaining medical sources. Griffin challenges ALJ Greener's credibility choices on multiple grounds.

Griffin asserts that ALJ Greener erred in giving only "little weight" to Dr. Toor's evidence. Griffin argues that Dr. Toor's opinion should have been given great weight or some minimal level of weight because Dr. Toor, as a consultative examiner, is "an expert is Social Security disability evaluation." (Dkt. No. 12, p. 10, 13). Griffin supports this assertion by citing Regulations establishing that State agency medical and psychological consultants are highly qualified and

---

[9]     Dr. Khan referred Griffin back to his treating physician with the recommendation that Oxycontin be switched to Nucynta for breakthrough pain, with Ultram prescribed for long term pain control. (T. 250). Dr. Khan opined that the newer medications have much less risk of diversion and development of tolerance of withdrawal symptoms. (*Id.*). Or, Dr. Khan noted that he could continue with Oxycontin as long as the dose is not increased. (*Id.*). He opined that frequent urine checks and cell counts would help. (*Id.*).

experts in Social Security disability evaluation.[10] (Dkt. No. 12, pp. 10-11). Griffin punctuates this argument by pointing out that ALJ Greener misidentified physician assistant Adams (whose opinions were give more weight than Dr. Toor's) as a "doctor" and as Griffin's "treating physician."

For essentially the same reason, Griffin challenges weight given to physician assistant Adams's opinions. Griffin argues that physician-assistant evidence is entitled to consideration only as an "other source," and cannot be afforded the great deference that treating-physician opinion receives.

Finally, Griffin challenges the "great weight" afforded to evidence from Dr. Khan and physician assistant Edwards. Griffin argues that evidence from these sources does not constitute "medical opinion," and, accordingly, is entitled to no weight. This argument relies in part on *Peach v. Astrue*, No. 6:08 CV 741(FJS/VEB), 2010 WL 4609325, at *5-6 (N.D.N.Y. Nov. 4, 2010).

## C. *Commissioner's Weighting Prescripts*

The Commissioner categorizes medical evidence by sources described as "treating," "acceptable" and "other." Administrative law judges are required to give controlling weight to opinions of treating sources[11] regarding the nature

---

[10]    *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). These provide:

State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.

*Id.*

[11]    *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record.[12] "Acceptable" medical sources are licensed  physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists.[13] An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment.[14] Finally, "other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists.[15] Evidence from these sources "is evaluated on key issues such as impairment severity and functional effects."[16] "Other" source opinions, even when based on treatment and special knowledge of an individual, never enjoy a controlling weight presumption.[17] Nor can "other" source opinion be relied upon to establish existence of a medically determinable impairment.[18]

Evidence from *all three sources*, however, can be considered when determining severity of impairments and how they affect individuals' ability to

---

[12]     20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[13]     20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources."  20 C.F.R. §§ 404.1502, 416.902.

[14]     SSR 06 03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006).

[15]     20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06 03p, 2006 WL 2329939, at *2.

[16]     *Id.*, at *2 3.

[17]     *Id.; see also* SSR 96 2p, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *1 (SSA July 2, 1996) (explaining controlling weight factors).

[18]     SSR 06 03p, 2006 WL 2329939, at *2

function. And, in *each* instance (except when controlling weight is given to a treating source's opinion), the degree of weight to be given such evidence is determined by applying certain generic factors: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence supporting the opinion; (4) how consistent the opinion is with the record as a whole; (5) specialization in contrast to the condition being treated; and (6) other significant factors.[19]

## D.   *Application and Analysis*

### 1.   Rejection of Dr. Toor Opinion

Griffin most assuredly is correct when arguing that Dr. Toor, a consulting orthopedic examiner, is deemed by the Commissioner to be an expert in Social Security disability evaluation. Based on that status, ALJ Greener might well have chosen to give Dr. Toor's opinions "great weight" as Griffin suggests. Dr. Toor's expertise, however, did not *require* that his opinions automatically receive great or even more than little weight. There is no requirement that an administrative law judge blindly accept opinion of a consultative examiner concerning a claimant's limitations when substantial evidence supports a decision to give less weight to such opinion. *See Pellam v. Astrue*, No. 12 1412,

---

[19]     *See* 20 C.F.R. §§ 404.1527(c), 416.927(c)(Aug. 24. 2012) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion"). This Regulation recently (March and August 2012) has been amended. Prior to the amendment on March 26, 2012, these two subsections were each numbered "(d)." The redesignation by amendment did not substantively change pertinent parts of the Regulation.

      *See also,* SSR 06 03p, 2006 WL 2329939, at *4 ("Although the factors in 20 C.F.R. 404.1527[c] and 416.927[c] explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'" ).

2013 WL 309998, at *2 (2d Cir. Jan. 28, 2013). Indeed, regulations themselves state that "[a]dministrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

Dr. Toor examined Griffin only once. Length, nature and extent of a treatment relationship are additional factors ALJ Greener was required to consider when determining how much weight to give acceptable source opinion. Indeed, the Second Circuit recently cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013). Moreover, the case cited and relied upon by Griffin echoes that "in general, an opinion based upon a single examination deserves limited weight."[20]

ALJ Greener properly afforded Dr. Toor's assessment little weight because it was inconsistent with other substantial evidence, namely the assessment of treating source Adams. (T. 25, 252-55). Moreover, Dr. Toor's own clinical findings of a normal gait, full extremity strength, no sensory or reflex deficits, no atrophy, and full and nearly full range of motion of the lower and upper extremities were not in line with Dr. Toor's restrictions. (T. 184).

There is no reversible legal or evidentiary error in ALJ Greener's decision to afford little weight to the consultative orthopedic examiner's opinions.

---

[20] *Steele v. Astrue*, No. 09 CV 347(NAM/VEB), 2011 WL 3841534, at *7 (N.D.N.Y. Aug. 10, 2011 (Bianchini, M.J.), *report and recommendation adopted by*, 2011 WL 3841536 (N.D.N.Y. Aug. 29, 2011) (Mordue, J.).

## 2. "Some Weight" Afforded to P. A. Adams's Opinions

ALJ Greener's references to physician assistant David Adams as *Dr. Adams* and as *claimant's treating physician* are conspicuous and embarrassing inaccuracies.[21]   Such sloppiness would result in reversible error had ALJ Greener given controlling weight to Adams's opinions or relied on Adams's assessment to determine existence of a medically determinable impairment. Neither circumstance occurred, however, and ALJ Greener's misidentification of Adams as a treating physician is an error of no consequence.

ALJ Greener clearly gave more weight ("some") to physician assistant Adams's opinions than she gave to Dr. Toor's opinions ("little") regarding Griffin's functional limitations.   This also does not suggest error.   The Commissioner's weighing prescripts expressly contemplate that opinions from "other" medical sources may outweigh opinions of "acceptable" medical sources:

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. *For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.*

SSR 06  03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT 'ACCEPTABLE MEDICAL SOURCES' IN DISABILITY CLAIMS, 2006 WL 2329939, at *5 (SSA Aug. 9, 2006) (emphasis added).

---

[21]   This mistake, although egregious, is somewhat understandable because the record reflects that both Griffin and his former counsel also identify Griffin's doctor as "Dr. Adams." (T. 36, 41, 137).

The remaining question is whether ALJ Greener properly evaluated Adams's functional assessment in accordance with the Commissioner's regulation and ruling cited above. Griffin cites no other impropriety, nor does independent review disclose any. Physician assistant Adams was, indeed, the primary treating source for Griffin. The length, nature and extent of the treatment relationship between Griffin and Adams, and the consistency of Adams's opinions with the record as a whole support ALJ Greener's decision to afford some or greater weight to Adams's opinions.

There is no reversible legal or evidentiary error in ALJ Greener's decision to afford "some weight" to the opinions of physician assistant Adams while giving "little weight" to the opinions of consultative examiner Dr. Toor.

3.    <u>"Great Weight" Afforded to P. A. Edwards and Dr. Khan</u>

ALJ Greener expressed her credibility findings with respect to physician assistant Edwards and Dr. Khan jointly:

> "We (*sic*) give great weight to the opinions of Dr. Edwards and Dr. Khan because they evaluated the claimant personally in the course of care[,] and their opinions are consistent with the preponderance of the medical evidence."

(T. 25).

Griffin argues that evidence obtained from Edwards and Dr. Khan does not constitute "medical opinion," and, consequently, is entitled to no weight.[22] Griffin cites the Commissioner's regulation stating that medical opinions express judgments about what claimants can still do despite impairments and associated

---

[22]    ALJ Greener also misidentified physician assistant Edwards as a doctor. (T. 24). For reasons stated earlier, this conspicuous inaccuracy, while stupefying, is without legal significance here.

limitations.[23]  Griffin bolsters the argument with a citation to *Peach v. Astrue*, a case decided in this district, wherein Magistrate Judge Bianchini observed that "*objective tests* are not medical opinions" and "as such, . . . clinical or diagnostic techniques. . . are not entitled to weight."[24]  District Judge Scullin agreed (when adopting the report) by stating that such tests "are simply one way in which an acceptable medical professional can support his opinion regarding a claimant's *functional limitations*."[25]

Griffin's argument, while resourceful, ultimately is much ado about nothing.  Although ALJ Greener *said* that she gave great weight to Edwards's and Dr. Khan's *opinions*, nothing in her written decision reveals that she relied on affirmative evidence from Edwards or Dr. Khan to make a residual functional capacity assessment.  (T. 26).  Indeed, neither source expressed opinions as to Griffin's ability to perform work-related activities, such that there was little evidence from either source to which she could have given great weight.

Rather, ALJ Greener clearly "credits" statements from these sources in the context of explaining why she found Griffin's subjective testimony not completely credible.  (T. 26-27).  ALJ Greener noted Griffin's declarations to accept recommended treatment referrals from either source, and also each source's reference to Griffin's propensity to use addictive narcotic medications.  (T. 24-

---

[23]     "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

[24]     *Peach v. Astrue*, No. 6:08 CV 741 (FJS/VEB), 2009 WL 7113220, at *5 (N.D.N.Y. Dec. 3, 2009) (Bianchini, M.J.) (emphasis added).

[25]     *See Peach v. Astrue*, No. 6:08 CV 741 (FJS/VEB), 2010 WL 4609325, at *2 (N.D.N.Y. Nov. 4, 2010) (Scullin, D.J.) (emphasis added).

25, 27).  When examined by Dr. Khan, Griffin did not complain of back pain. (T. 248).  And, with respect to physician's assistant Edwards, Griffin appeared to be in no great distress.  (T. 198).

*Peach v. Astrue* is not analogous.  There, a social security claimant complained that the Commissioner failed to apply the treating physician rule to results of objective diagnostic techniques (nerve conduction studies and magnetic resonance imaging) submitted to the Veterans Administration in an application for service-related benefits.  The court rightly concluded that objective diagnostic test results do not require the six-factor analysis that the Commissioner's regulation establishes for determining how much weight to afford treating physician opinion.  *See Peach v. Astrue*, No. 6:08  CV  741 (FJS/VEB), 2009 WL 7113220 (N.D.N.Y. Dec. 3, 2009), *report and recommendation adopted by*, 2010 WL 4609325 (N.D.N.Y. Nov. 4, 2010).

*Peach v. Astrue*, however, does not infer that objective diagnostic tests are meaningless; rather it makes clear that objective test results, whatever their nomenclature, are *relevant evidence that may be considered*.  The administrative law judge in *Peach* considered results of nerve conduction studies and magnetic resonance imaging.  The court determined that the judge afforded them "appropriate weight." *See Peach*, 2010 WL 4609325, at *2.

Likewise, ALJ Greener did not err in considering findings, observations and recommendations of physician assistant Edwards and Dr. Khan when assessing nature and severity of Griffin's impairments.  Her use of "great weight" is but another example of careless semantics; irksome but harmless.

# VI. Subjective Evidence

*A.*    *Griffin's Testimony*

Griffin testified that he has been unable to work because of pain associated with a herniated disc in his neck. (T. 24, 39-40). Additionally, he complained of worsening back pain. (T. 42). As for treatment, Griffin stated that he had once had a cortisone injection, which made him feel poorly, and he has since refused injections as part of his treatment. (T. 40-41). Griffin also stated that surgery had been raised as a possible treatment; however, he refuses to undergo surgery because he is "a little scared of that too." (T. 41). Griffin attended physical therapy several times, but claimed it did not improve his conditions and the sessions were cancelled. (T. 42).

Regarding daily activities, Griffin stated that his father has a camp, where Griffin and his family stay in the summer. (T. 43). There, he sits around in the camper and "play[s] dice or cards or something. . . just basically sit and stand all day." (T. 43-44). He cooks some on the grill and goes grocery shopping with his wife (T. 43-44); he received visitors (T. 44).

In an earlier written Function Report dated March 16, 2009, Griffin reported that he "sit[s] in front of the TV most of the day." (T. 132). He carries "about ten arm loads of wood" from outside into his home, feeds the dog, and "pick[s] up the yard." (T. 132, 134, 137). He has no problem with personal care and needs no reminder to do so or to take medication. (T. 132-33). He cooks on the grill in the summer. (T. 133). He drives, travels unaccompanied, shops for groceries twice monthly, and can handle money. (T. 135). He fishes and camps at his father's camp, where he also performs work. (T. 135-36). He can finish what he starts, as well as follow spoken and written instructions. (T. 137). Medication relieves his pain to the point it is tolerable without side effects. (T. 140).

*B.    ALJ Greener's Assessment of Griffin's Credibility*

ALJ Greener concluded that Griffin's subjective statements concerning intensity, persistence and limiting effects of his symptoms are "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (T. 26).  ALJ Greener elaborated:

> The claimant's allegations are not fully credible because they are not consistent with what he told his treating physician, his course of treatment and his activities as described in reports to SSA as well as testimony.  Although he does have a demonstrable pathology, clinical examinations have been relatively benign, as described above. Essentially he has declined all treatment except for 4 PT sessions and narcotic medications, particularly oxycontin.  He was discharged from pain management for what the physician described as "suspicious" behavior.  The claimant described activities, including carrying wood, which are inconsistent with his testimony and allegations to the Social Security Administration.  He described in his function report sitting around all day watching TV, and his testimony depicted him sitting around playing cards and dice.  These activities fail to support an allegation that he cannot sit for prolonged periods.

(T. 26-27).

*C.    Griffin's Challenge*

Griffin argues that ALJ Greener erred in her evaluation because she used boilerplate language finding that Griffin was not credible to the extent his statements were inconsistent with her own residual functional capacity assessment.  This argument is based on a growing body of cases that conclude it is error to measure a claimant's credibility only by assessing consistency of his statements with the administrative law judge's own residual functional capacity finding, instead of evaluating all the required factors bearing on claimant's

credibility prior to deciding claimant's residual functional capacity.[26] Griffin also maintains that ALJ Greener failed to specifically consider other parts of Griffin's testimony regarding increased limitations and pain. (Dkt. No. 12, pp. 16-20 & n.5).

## D.  Commissioner's Rules for Weighing Subjective Testimony

Pain is an important element in disability claims, and pain evidence must be thoroughly considered. *See Ber v. Celebrezze*, 332 F.2d 293, 298  99 (2d Cir. 1964).  The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom.  Testimony from claimants, therefore, is not only relevant, but desirable.

On the other hand, such testimony may be colored by the claimant's interest in obtaining a favorable outcome.  Hence, subjective symptomatology by itself cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged.[27]

The Commissioner again provides explicit guidance to help administrative law judges decide how much weight to give claimants' subjective self-evaluations.  First, a formally promulgated regulation requires  once an impairment is identified   consideration of seven specific, objective factors that naturally support or impugn subjective testimony of disabling pain and other

---

[26]   *Cornell v. Astrue*, No. 7:11 CV 1064 (GTS), 2013 WL 286279, at *8 & n.4 (N.D.N.Y. Jan. 24, 2013)(collecting cases).

[27]   *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96 7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996); SSR 96 4p, TITLES II AND XVI: SYMPTOMS, MEDICALLY DETERMINABLE PHYSICAL AND MENTAL IMPAIRMENTS, AND EXERTIONAL AND NONEXERTIONAL LIMITATIONS, 61 Fed. Reg. 34488 01, 34489, 1996 WL 362210 (SSA July 2, 1996).

symptoms.[28]  Second, a ruling directs administrative law judges to follow a two-step process:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

*See* SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996).  The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id*.[29]

---

[28]     An administrative law judge must evaluate a claimant's symptoms, including pain, based on the medical evidence and other evidence, including he following factors:

    (i) claimant's daily activities;
    (ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
    (iii) precipitating and aggravating factors;
    (iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
    (v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
    (vi) measures claimant uses or has used to relieve pain or other symptoms; and
    (vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

[29]     Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when administrative law judges reject claimants' testimony of pain and limitations, they must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260 61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).

## E.     *Application and Analysis*

Griffin correctly points out that ALJ Greener used meaningless and suspicious boilerplate language when expressing her credibility choice regarding Griffin's subjective statements.  (T. 26).  Were such language the *only* reason provided, a reviewing court might well agree that the credibility choice was defective and unsusceptible to meaningful judicial review.  However, ALJ Greener provided a full and detailed explanation (quoted above), and that articulation reflects that she considered the objective factors identified in the Regulation to the extent there was evidence thereof, engaged in the two-step process as required by the applicable Ruling, and provided explicit reasons for finding Griffin's subjective complaints not fully credible.  (T. 26-27).  Thus, there is no structural legal error in administrative law judge Greener's approach to assessing credibility of Griffin's subjective testimony regarding persistence, intensity and limiting effects of his symptoms.

This point of error ultimately boils down to a quarrel with the evidentiary basis for the finding that Griffin's subjective testimony was not credible.  ALJ Greener acknowledged that Griffin has a demonstrable pathology, but observed correctly that clinical examinations have been relatively benign.  (T. 26-27).  She also found that Griffin's testimony posed greater limitations than statements he made to his doctors and in his function report filed in connection with his applications.  (T. 27, 132-41).  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  *See* SSR 96-7p, 1996 WL 374186, at *5.

It is rudimentary that an administrative law judge is "not require[d] to accept subjective complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Rather, an administrative law judge "may exercise discretion

in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* And, for judicial review purposes, nothing is more firmly established than that "[i]t is the function of the [Commissioner], not [the Courts], ... to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

While some reasons given by ALJ Greener are stronger than others, all have evidentiary bases, and, in each instance, the evidence satisfies the highly deferential "more than a scintilla" substantial-evidence standard.[30] There is no basis, therefore to reverse the Commissioner's decision because of a legal or evidentiary error in assessing Griffin's credibility.

## VII.   Utilization of Medical-Vocational Guideline

Griffin's final point challenges ALJ Greener's determinations that Griffin can still perform alternative jobs available in the national economy, and that Griffin, therefore, is not disabled. ALJ Greener made these findings by referring to and relying only on Medical-Vocational Guidelines. (T. 27). She did not elicit expert vocational testimony or obtain additional evidence on the issue of alternative, available jobs or Griffin's ability to perform them.

## A.   *Medical-Vocational Guidelines ("the Grids")*

At Step 5 of sequential disability analysis, administrative law judges determine whether claimants, despite their impairments, can still do work existing in the national economy. At this stage, the burden rests with the Commissioner.

---

[30]    "Substantial evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In some circumstances, however, they may take *administrative notice* of disability *vel non* by adopting and applying findings published in *"Medical-Vocational Guidelines,"* commonly called *"the grids." See Roma v. Astrue*, 468 Fed. App'x 16, 20-21 (2d Cir. 2012); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)*; see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

The Medical-Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

When only *exertional* impairments are in play,[31] and findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, administrative law judges may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir. 2009); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (Commissioner can meet Step

---

[31]    An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b).

5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

Grid rules cannot be applied directly when residual functional capacity findings do not coincide with all grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. And, since the grids do not take into account limiting or disabling effects of *nonexertional* impairments,[32] direct application of the grids to determine disability is not appropriate when claimants' nonexertional impairments have more than a negligible impact on their ability to perform a full range of work. *See Selian*, 708 F.3d at 421 (*quoting Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)). In such instances, additional, extrinsic evidence from a vocational expert or equivalent source is required. *Id.* Nonetheless, the grids may still be applied directly when nonexertional limitations only *slightly* erode the *sedentary* occupational base. *See* SSR 96 9p, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

*B.    Application*

Griffin's residual functional capacity for sedentary work, as determined by ALJ Greener, is not reduced by any nonexertional limitation. Under that circumstance, ALJ Greener had no duty or reason to elicit expert vocational

---

[32]    "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet . . . demands of jobs other than . . . strength demands . . .." *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Therefore, a nonexertional limitation is an impairment caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96 9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

testimony or equivalent evidence in lieu of a grid finding. She accurately determined, moreover, that Medical-Vocational Guidelines, Rule 201-28, declares that alternative jobs exist in the national economy that persons similarly situated to Griffin (in terms of age, education, prior work experience and residual functional capacity) can perform, and that it directs a conclusion of "not disabled." Hence, there is no apparent evidentiary deficiency.

Griffin's attack is premised on a supposition that Griffin *does* have nonexertional impairments that produce more than a negligible impact on his ability to work. Indeed, his first two points of error argued that ALJ Greener's residual functional capacity assessment for a full range of sedentary work without exertional or nonexertional limitations was flawed, and that a properly-assessed residual functional capacity *should have* included significant exertional and nonexertional limitations. But, since neither of these earlier points of error is meritorious, this final argument falls under its own weight.

## VIII.   Conclusion and Recommendation

ALJ Greener's residual functional capacity finding is not infirm due to legal error in assessing credibility of medical source and subjective testimony. Her finding of "not disabled" was appropriately directed by Medical-Vocational Rule 201.28 (T. 27), and there was no evidentiary deficiency stemming from lack of testimony from a vocational expert. Therefore, none of the proffered errors should be sustained, and the Commissioner's decision denying disability-based benefits should be **AFFIRMED**.

## IX.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___17___ day of ___September___ 2013.

Earl S. Hines
United States Magistrate Judge